EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* JULIÁN OTERO y ALBERTO NAVEDO, acusados y apelantes.

Núm. 11990.—*Sometido:* Mayo 2, 1947. *Resuelto:* Junio 4, 1947.

*José L. Feliú Pesquera,* abogado del apelante *Otero;* Hon. *Procura-*
*dor General Luis Negrón Fernández,* y *Joaquín Correa Suárez,*
*Fiscal Auxiliar del Tribunal Supremo,* abogados de El Pueblo,
apelado.

El Juez Presidente Señor Travieso emitió la opinión del tri-
bunal.

Julián Otero y Alberto Navedo fueron acusados ante la
Corte de Distrito de Bayamón por un delito de asesinato y
solicitaron juicios separados. Celebrado el juicio contra Ju-
lián Otero, el jurado le declaró culpable de asesinato en pri-
mer grado. La Corte inferior, después de declarar sin lu-
gar la moción de nuevo juicio le condenó a la pena de reclu-
sión perpetua por el asesinato y a seis meses de cárcel por
la portación ilegal del arma. Contra ambas sentencias el
acusado ha interpuesto el presente recurso, basándolo en
cuatro señalamientos de error.

Alega el apelante que la Corte inferior cometió grave
error de derecho al permitir que el Fiscal leyera al Jurado la
confesión hecha por el acusado ante el juez instructor, sin
que antes se presentara al Jurado prueba de que la confesión
había sido hecha voluntariamente. Examinemos el récord.

Pedro Marrero, el primer testigo de cargo, declaró en sín-
tesis que en la noche de autos mientras se celebraba un baile
en su casa ocurrió un disgusto entre Tomás Figueroa y Fede-
rico Otero; que Figueroa salió de la casa corriendo, y Julián
Otero y Alberto Navedo, los acusados, se le fueron detrás,

por el camino de las cañas; que el declarante se fué detrás de ellos; que cuando llegaron al camino que llega a la carretera, al llegar Figueroa al puente el acusado Julián Otero le tiró con el puñal por la espalda; que cuando Figueroa corrió, Otero corrió detrás de él, gritándole a Navedo "Cógelo 'Cabo' que por ahí va corriendo"; que el declarante siguió detrás de ellos y cuando llegó encontró a Figueroa en el suelo, herido y quejándose y allí se quedó muerto; que vió a cada uno de los dos acusados con un puñal en la mano.

Enrique Rodríguez, declaró que como a las 12:30 de la noche sintió un tumulto de gente que pasaba por el camino y poco después los gritos de una persona que se quejaba; que momentos después sintió unas personas que corrían y una de ellas decía "Cabo espérame"; que el declarante se tiró por el frente de la casa y fué al sitio donde había oído los quejidos y allí encontró a Tomás Figueroa herido y moribundo; que al día siguiente Felipe Santiago Rodríguez al pasar por allí encontró un puñal y se lo entregó al declarante, quien lo entregó a la policía.

El testigo Rafael Molina González, Jefe de la Policía Insular en Vega Baja, declaró que al tener conocimiento del suceso se trasladó al sitio donde yacía el cadáver de Tomás Figueroa; que registró el cadáver y no encontró arma alguna; que arrestó a Julián Otero y a Alberto Navedo y los llevó al Cuartel de la Policía; que cuando estaba haciendo la investigación, el acusado Julián Otero, "voluntariamente y sin protesta alguna, sin halago de ninguna clase, y sin promesa de nada, le manifestó lo siguiente:

"R. ...Que él estaba en la casa de un tío de él que se llama Pedro Marrero; que en esa casa se estaba celebrando un baile; que mientras bailaban Tomás Figueroa tuvo una discusión, un disgusto con otro individuo que se llama Federico Otero; que al ver que Tomás Figueroa le tiró a Federico Otero, él trató de intervenir. Que Tomás entonces se tiró abajo, se fué del baile; que entonces él y un tal Alberto Navedo se le fueron detrás a Tomás Figueroa y detrás se les fué Pedro Marrero ..." (Tr. de Ev. pág. 48)

Declarada sin lugar la objeción de la defensa el testigo continuó declarando:

"R. ...Entonces me dijo que habían perseguido entre él, Julián Otero, y el otro, Alberto Navedo, a este individuo Tomás Figueroa; que iban andando ligero como un cuarto de hora; que se metieron por un camino entre dos cañaverales; que entonces Navedo le atrechó alante a Tomás Figueroa y él le siguió detrás a Tomas Figueroa. Que cuando Tomás Figueroa le iba corriendo alante, él (Julián Otero) con un cuchillito que le había cogido prestado a un tal Eugenio, le dió una puñalada por la espalda a Tomás Figueroa con el cuchillo; que el cuchillo se rompió. Que cuando Tomás Figueroa seguía corriendo hacia en donde se encontraba Alberto Navedo, él, (Julián Otero) le decía 'Atájalo Cabo'; 'Atájalo Cabo.' Que luego Tomás Figueroa al encontrarse con Alberto Navedo, Alberto Navedo le tiró con un cuchillo a Tomás Figueroa, hiriéndolo, cayendo en el suelo boca arriba con un flash light que tenía en las manos. Que después allí se encontró con Pedro Marrero, el tío de él cuando llegó al sitio de los hechos. Eso fué lo que me dijo a mi Julián Otero y después todo eso lo ratificó Julián Otero en presencia del Juez Municipal de Vega Baja, que era entonces el Licenciado Felipe Marchand, al otro día del suceso, o sea el mismo día en que yo me personé al barrio 'Ceiba Sabana' de Vega Baja y a la casa del señor Rodríguez, un mayordomo de la Central.

"Eso mismo este joven lo ratificó ante el Juez Municipal de Vega Baja, en la Corte Municipal de Vega Baja." (Tr. de E., pg. 49–51.)

Terminó el testigo diciendo que llevó al acusado ante el Juez Municipal y que le dijo al Juez: "Mire Juez, este hombre declaró ante mí que él es el autor de la muerte del muchacho ése, Tomás Figueroa. Este hombre tiene conocimiento de los hechos."

El Fiscal anunció entonces que iba a presentar la confesión de Julián Otero tomada por el Juez Municipal de Vega Baja, bajo juramento, al día siguiente del suceso; y pidió que se hiciera retirar el Jurado, "para que la Corte después de oír al Juez instructor determine sobre su admisibilidad." Acto seguido y por ser ya las 12:30 P.M. la Corte ordenó la suspensión de la vista para que el Jurado fuese llevado a almorzar. Al comenzar la sesión de la tarde, las partes acep-

taron que el Jurado era el mismo y que estaba completo; y entonces, en presencia del Jurado, declaró el Juez Instructor, Sr. Marchand, diciendo en síntesis lo que sigue:

Que él llevó a los dos acusados y a Pedro Marrero, el dueño de la casa, al salón de la Corte; que después de haber declarado Marrero todo lo que sabía, en presencia de los dos acusados, el acusado Julián Otero le dijo al Juez declarante: "Pues también yo quiero declarar," y que el declarante le contestó: "Pues encantado de la vida, declare usted"; que entonces Otero declaró y su declaración se puso por escrito, pero que antes de tomarle la confesión a dicho acusado, el juez declarante le dijo "que podía incriminarse si declaraba, que él estaba acusado, que la declaración de él podría utilizarse en su contra." Continuó el juez municipal declarando sobre otras gestiones practicadas por él en relación con la investigación del caso, y al terminar su declaración el Fiscal solicitó que hiciese retirar el Jurado. Después de haberse retirado el Jurado, el Fiscal anunció que antes de ofrecer en evidencia la confesión hecha por el acusado deseaba presentar la declaración del Juez Municipal, Sr. Marchand, sobre la voluntariedad de la confesión.

El Juez Marchand declaró: Que antes de declarar Julián Otero él le hizo las advertencias de ley: "que él tenía derecho a declarar o a no declarar" y "que de declarar que lo hiciera voluntariamente"; que no le hizo promesa alguna, ni halago alguno; que nadie le amenazó. ni le pegó, ni le hizo ofrecimiento de clase alguna; que después de haberle hecho esas advertencias, el acusado insistió en declarar y entonces él le tomó la declaración; que la firma que aparece al pie de la declaración es la del acusado y que éste firmó la declaración después de haberla leído él mismo.

La defensa ofreció entonces el testimonio del acusado, con el solo propósito de impugnar la declaración del Juez Marchand en cuanto a la voluntariedad de la confesión. El acusado declaró: Que en ningún momento se le hizo la advertencia de que si declaraba su declaración podría ser utilizada

en su contra; que la policía le pegó en la calle; que fué el policía Olivieri el que le pegó por la frente y lo empujó por la parte de atrás, por los riñones; que él no leyó la declaración, pero la firmó; que no le dijeron que leyera la declaración, que le dijeron "firme aquí" y él la firmó; que él fué obligado a firmar esa declaración; que él estaba loco de miedo, porque nunca se había metido en eso; que el Juez Municipal ni le pegó ni le amenazó, pero le hablaba en voz dura.

La Corte resolvió admitir la confesión, la defensa tomó excepción y el jurado fué traído a la sala. Solicitó el fiscal permiso para leer al jurado la confesión, se opuso la defensa "por entender que dicha declaración no fué prestada voluntariamente de acuerdo con la prueba que se le presentó al señor Juez"; y la Corte autorizó al fiscal para leer la declaración, tomando excepción la defensa.

La declaración leída al jurado dice así:

"En Vega Baja, P. R., a los 4 días de noviembre de 1945, ante esta corte comparece JULIAN OTERO APONTE, negro, mayor de edad, soltero y vecino de Bo. Ceiba, sitio Pueblo Nuevo de Vega Baja, P. R., y previo juramento conforme a la ley, dice:

"Que me llamo como queda dicho y soy de las circunstancias personales arriba mencionadas.

"Que después de habérseme advertido el derecho que tengo a no declarar por poderse utilizar en mi contra la presente declaración y sin que medie amenaza, violencia, intimidación u ofrecimiento de clase alguna insisto en declarar y libremente declaro:

"Que yo me encontraba en un baile el día sábado 3 de noviembre de 1945 y en la casa de mi tío Pedro Marrero que queda en el sitio Pueblo Nuevo del Bo. Ceiba de Vega Baja, cuando mi primo Federico Otero iba bailando con una muchacha y Tomás Figueroa le tiró rompiéndole la camisa. Que al yo ver que Tomás le tiró a mi primo Federico yo traté de intervenir. Que en eso Tomás Figueroa echó a correr y yo me le esguindé detrás. Detrás de mi venía mi tío Pedro Marrero y Alberto Navedo venía también detrás de Tomás Figueroa. Que en la carrera cruzamos la carretera y nos metimos en un camino entre dos cañaverales en donde vive don Enrique Rodríguez. Que en los momentos en que Tomás Figueroa pasaba por el lado mío yo le tiré con un cuchillito. Que Tomás Figueroa siguió corriendo a pesar

de que yo sentí que mi cuchillito tropezó con su cuerpo hasta que llegó y se enfrentó con Alberto Navedo que se encontraba al otro lado de un puentecito que hay en el camino. Que cuando Tomás Figueroa corría hacia el sitio donde se encontraba Alberto yo le decía a Alberto, 'Cójelo Cabo que va corriendo,' refiriéndome a Tomás Figueroa. Que cuando Tomás se enfrentó con Alberto, Alberto le acometió y agredió con un cuchillo que tenía en las manos y con el que le esperaba. Que en los momentos en que Alberto atacaba a Tomás con el cuchillo Tomás cayó para atrás quedando en el suelo boca arriba con una linterna que tenía en la mano. Que cuando Tomás cayó al suelo mi tío Pedro Marrero y yo llegamos hasta donde él. Que Tomás Figueroa se encontraba tendido en el suelo y diciendo 'Ay Berto no me mates.' Que mi tío Pedro Marrero alumbró con una linterna y yo pude ver bien a Tomás Figueroa y al retirarnos del sitio de los hechos recuerdo que mi tío Pedro Marrero nos dijo que dejáramos a Tomás que ya lo habíamos matado, contestando Alberto 'déjalo que se joda ese perro que ya está muerto.'

"Juez. P.—¿Le vió usted algún arma a Tomás mientras Uds. lo atacaban?

"Test. R.—No, yo no le ví nada.

"Juez. P.—¿Oyó Ud. ladrar unos perros por el sitio de los hechos?

"Test. R.—Sí, yo oí ladrar unos perros.

"Juez. P.—¿Ese cuchillo que Ud. utilizó para agredir a Tomás dónde lo encontró Ud.?

"Test. R.—Ese cuchillito se lo pedí yo prestado a mi primo Geño Marrero y Geño me lo prestó el día sábado 3 de noviembre de 1945 y al obscurecer.

"Juez. P.—¿Recuerda Ud. si ese cuchillito que le prestó Geño se le partió en algún momento?

"Test. R.—Sí, cuando yo le tiré con el cuchillito a Tomás Figueroa en los momentos en que pasaba por el lado mío, yo noté que el cuchillito tropezó con el cuerpo y ahí se me partió, cayendo la hoja del cuchillito al suelo quedándome yo con el cabito en la mano.

"Juez. P.—¿Ud. le enseñó el cabito del cuchillito a alguien?

"Test. R.—Sí, yo se lo enseñé a mi tío Pedro Marrero y le dije que se me había partido cuando le había tirado a Tomás Figueroa y que el cuchillito era de Geño.

"Juez. P.—¿Esa hoja de puñal que yo le muestro a Ud. la ha visto Ud. anteriormente?

"Test. R.—Sí, esa hoja de puñalito es la hoja del cuchillito que me prestó mi primo Geño y con el que agredí a Tomás Figueroa.

"Juez. P.—¿Por qué fué que Ud. acometió y agredió a Tomás Figueroa con ese cuchillito?

"Test. R.—Yo lo acometí a Tomás con el cuchillito porque él había ofendido en el baile a mi primo Federico y le había roto la camisa."

La defensa no presentó prueba alguna, quedando el caso sometido por la prueba de El Pueblo.

Se queja el apelante de que la Corte permitiese al Fiscal leer la confesión del acusado, estando el Jurado presente, "Sin que se hubiera presentado prueba ante el Jurado de la supuesta voluntariedad de la confesión." Y cita en apoyo de su contención nuestras decisiones en *Pueblo* v. *Domes,* 56 D.P.R. 211, 220 y en *Pueblo* v. *Declet,* 65 D.P.R. 23, 26.

En *Pueblo* v. *Domes,* supra, resolvimos que "cuando las manifestaciones del acusado ofrecidas en evidencia equivalen a una confesión de culpabilidad, el fiscal está obligado a demostrar previamente que la confesión fué hecha voluntariamente y no bajo la influencia de promesas o de amenazas" y que "cuando las declaraciones del acusado no constituyen una confesión y sí una admisión, el fiscal no está obligado a probar previamente el carácter voluntario de las mismas."

En *Pueblo* v. *Declet,* supra, la única evidencia ofrecida por el fiscal para conectar al acusado con la comisión del delito fué la confesión extrajudicial hecha por el acusado. Al empezar el fiscal a probar la confesión, la defensa se opuso a su admisión mientras no se probase el carácter voluntario de las declaraciones hechas por el acusado. La Corte inferior admitió la confesión sin determinar previamente si en efecto era admisible. Al revocar la sentencia y ordenar la celebración de un nuevo juicio, esta Corte, por voz del Juez Asociado Sr. De Jesús, se expresó así:

"Ya hemos dicho que para que la confesión extrajudicial sea admisible es necesario probar que fué hecha voluntariamente. La prueba de la confesión consiste de dos etapas. La primera es función exclusiva del juez. En ésta, al ofrecerse en evidencia la confesión, el juez debe oír la prueba tendente a demostrar si la confesión fué

o no voluntariamente hecha. La mejor práctica es que en esta fase del caso el jurado no se halle presente. Si el juez determina como cuestión de derecho que hay prueba suficiente para someter al jurado la cuestión sobre el carácter voluntario de la confesión, permitirá que el jurado oiga dicha prueba, si es que éste había sido retirado, y después oirá el jurado la prueba sobre la confesión, incumbiendo entonces al jurado determinar como cuestión de hecho, si fué o no voluntariamente hecha. Si cree que no lo fué, es su deber no considerarla. (Citas.) El peso de la prueba sobre el carácter voluntario de la confesión, como cuestión de hecho, recae sobre el fiscal.''

La confesión hecha ante un juez municipal en el curso de una investigación tiene carácter extrajudicial. Wharton, *Criminal Evidence*, (11a. edición, 1935) sec. 586, pág. 967; *El Pueblo* v. *Kent*, 10 D.P.R. 343.

Es doctrina establecida por numerosa jurisprudencia que antes de que una confesión extrajudicial pueda ser admitida en evidencia el fiscal debe probar que fué hecha voluntariamente. *Pueblo* v. *Declet*, supra; 3 Wigmore, *Evidence* (3ra. ed., 1940) sec. 860, pág. 342; Anotaciones en 102 A.L.R. 605.

Las alegaciones del apelante de que el fiscal leyó la confesión al jurado, ''sin que se hubiera presentado prueba ante el jurado de la supuesta voluntariedad de la confesión'' y que ''el jurado no tuvo ante su consideración prueba ninguna sobre el supuesto carácter voluntario de la confesión que fué admitida en evidencia,'' no están sostenidas por el récord. La primera declaración del Juez Instructor Marchand fué prestada ante el jurado. Sin objeción alguna por parte del acusado, relató el Juez Marchand cómo, después de oír la declaración del testigo Pedro Marrero, el acusado le dijo al Juez que él también quería declarar; que antes de tomarle declaración al acusado el Juez le hizo las advertencias legales, diciéndole que podría incriminarse si declaraba y que la declaración podía ser utilizada en su contra. La declaración prestada por el Juez Marchand ante la corte, en ausencia del jurado, fué prácticamente una repetición de la que ya había prestado ante el jurado y que tendía a demostrar que la con-

fesión había sido hecha por el acusado voluntariamente. Después de oír la declaración del acusado tendiente a demostrar que la confesión no había sido hecha voluntariamente, incumbía a la corte determinar si había prueba suficiente que justificase someter al jurado la cuestión de la voluntariedad de la confesión. La corte, en ausencia del jurado, resolvió que la había. Es cierto que el fiscal no siguió estrictamente la regla sentada en el caso de *Declet,* presentando primeramente ante la corte, en ausencia del jurado y después ante éste la evidencia sobre la voluntariedad de la confesión. Empero, esa desviación del procedimiento en nada perjudicó al acusado. Véase *Pueblo* v. *Ortiz,* 42 D.P.R. 135 y Anotaciones en 148 A.L.R. 546 y 102 A.L.R. 625. Habiendo resuelto la corte, como cuestión preliminar, que la confesión era admisible, no era necesario que se llamase nuevamente al Juez Instructor para que declarase por segunda vez ante el jurado lo que ya había declarado anteriormente en cuanto a la voluntariedad de la confesión. Al solicitar el fiscal permiso para leer al jurado la confesión, el acusado se limitó a hacer constar su objeción "por entender que dicha declaración no fué prestada voluntariamente de acuerdo con la prueba que se le presentó al señor juez." El acusado pudo y debió ofrecer en ese momento, para ser sometida al jurado, la prueba de que disponía para controvertir la prueba del fiscal. Ni el fiscal ni la corte podían llamar al acusado a declarar, pues éste tiene el derecho de abstenerse de prestar declaración. El acusado tuvo una nueva oportunidad para presentar al jurado su declaración en contra de la alegada voluntariedad de la confesión, cuando el fiscal, después de ser admitida la confesión, cerró su caso. No solamente no la aprovechó, sino que anunció que no iba a presentar prueba y que sometía el caso con la misma prueba de El Pueblo. No habiendo hecho uso de su derecho a presentar prueba, el apelante no puede ahora quejarse de que el jurado oyese solamente la prueba demostrativa de la voluntariedad de su confesión.

414

■■ En el segundo señalamiento se alega que le corte inferior cometió grave error de derecho al denegar parte de las instrucciones adicionales solicitadas por la defensa.

De la transcripción de las instrucciones dadas por la corte al jurado aparece que al comenzar el juez a instruir al jurado en relación con la confesión admitida en evidencia, el abogado defensor le interrumpió, diciendo: "Si me lo permite vuestro honor queremos hacer constar que hemos presentado un escrito solicitando una instrucción especial." Continuó el juez instruyendo al jurado sobre la confesión y terminó diciendo: "La Corte va a conceder parte de esta instrucción sometida por la defensa . . . ." La defensa tomó excepción y el juez continuó diciendo:

"La Corte instruye al jurado que la confesión extrajudicial, para ser admisible, es necesario probar que fué hecha voluntariamente."

El apelante no se queja de que se diera al jurado la instrucción que acabamos de transcribir y sí de que no se le trasmitiese la parte que alega fué denegada por la corte. No nos ha colocado el apelante en condiciones de que podamos resolver si la corte inferior cometió el error que se le imputa. En ninguna parte del récord encontramos copia del escrito presentado por el acusado solicitando una instrucción especial. No sabemos, pues, qué fué lo que el acusado solicitó y la corte le negó. El apelante se ha limitado a decirnos en su alegato que "las instrucciones adicionales solicitadas por la defensa eran *casi* una copia fiel y exacta de las palabras dichas por este Hon. Tribunal en el caso de *El Pueblo* v. *Declet.*" La palabra "casi", que aparece en bastardillas, es un adverbio de cantidad que significa cerca de, poco menos de, aproximadamente, con corta diferencia, por poco. Pudiera suceder que esa corta diferencia entre lo que dijo este Tribunal en el caso de *Declet* y lo que se decía en la instrucción suplicada por la defensa, fuera suficiente para justificar la denegación de la instrucción.

■ El tercer señalamiento se refiere a la resolución de la corte inferior declarando sin lugar la moción de nuevo juicio. La moción se basaba en la alegada comisión de los dos errores que ya hemos discutido. No habiendo sido éstos cometidos, debemos resolver que no erró la corte inferior al negarse a conceder un nuevo juicio.

Hemos hecho un estudio cuidadoso de la prueba y opinamos que es suficiente para justificar el veredicto y las dos sentencias impuestas al acusado.

*Las sentencias recurridas deben ser confirmadas.*